**Nos. 25-2497(L), 26-1002**

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

E.K., BY AND THROUGH PARENT AND NEXT FRIEND LINDSEY KEELEY, et al.,
*Plaintiffs-Appellees/Cross-Appellants*

v.

DEPARTMENT OF DEFENSE EDUCATION ACTIVITY, et al.,
*Defendants-Appellants/Cross-Appellees*

Appeal from the U.S. District Court for the Eastern District of Virginia,
Hon. Patricia Tolliver Giles, U.S. District Court Judge

## PRINCIPAL BRIEF FOR APPELLEES/CROSS-APPELLANTS

MATTHEW W. CALLAHAN
EDEN HEILMAN
ACLU OF VIRGINIA FOUNDATION
P.O. BOX 26464
RICHMOND, VA 23261
(804) 644-8080
mcallahan@acluva.org
eheilman@acluva.org

COREY M. SHAPIRO
WILLIAM E. SHARP
ACLU OF KENTUCKY FOUNDATION
325 W. MAIN STREET, SUITE 2210
LOUISVILLE, KY 40202
(502) 581-9746
corey@aclu-ky.org
wsharp@aclu-ky.org

EMERSON J. SYKES
ACLU FOUNDATION
125 BROAD STREET, 18TH FLOOR
NEW YORK, NY 10004
(212) 549-2500
esykes@aclu.org

*Counsel for Plaintiffs-Appellees/Cross-Appellants*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

STATEMENT OF JURISDICTION ........ 2

STATEMENT OF THE ISSUES ........ 3

STATEMENT OF THE CASE ........ 3

SUMMARY OF ARGUMENT ........ 9

STANDARD OF REVIEW ........ 12

ARGUMENT ........ 14

I. THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION ........ 14

A. Plaintiffs are likely to succeed on the merits of their First Amendment claims ........ 15

1. Plaintiffs have standing ........ 15

2. DoDEA's book quarantines violate the First Amendment ........ 21

3. DoDEA curriculum removals violate the First Amendment ........ 29

B. The remaining *Winter* factors favor Plaintiffs ........ 38

II. THE PRELIMINARY INJUNCTION SHOULD APPLY SYSTEM-WIDE ........ 40

CONCLUSION ........ 42

ORAL ARGUMENT STATEMENT ........ 42

# TABLE OF AUTHORITIES

**Cases**

*ACLU of Florida, Inc. v. Miami-Dade County School Board*,
557 F.3d 1177 (11th Cir. 2009) .................................................... 16, 25

*Air Evac EMS, Inc. v. McVey*,
37 F.4th 89 (4th Cir. 2022) .......................................................................12

*Arce v. Douglas*,
793 F.3d 968 (9th Cir. 2015) .................................................................. 29, 30

*Board of Education Island Trees Union Free School District No. 26 v. Pico*,
457 U.S. 853 (1982)...................................................................... *passim*

*Boring v. Buncombe County Board of Education*,
136 F.3d 364 (4th Cir. 1998) .................................................................. 32, 33

*Case v. Unified School District No. 233*,
895 F. Supp. 1463 (D. Kan. 1995)........................................................ 20, 22

*Centro Tepeyac v. Montgomery County*,
722 F.3d 184 (4th Cir. 2013) .................................................................. 12, 39

*Chiras v. Miller*,
432 F.3d 606 (5th Cir. 2005) ......................................................................31

*Cockrel v. Shelby County School District*,
270 F.3d 1036 (6th Cir. 2001) ....................................................................33

*Connick v. Myers*,
461 U.S. 138 (1983)..................................................................................32

*Counts v. Cedarville School District*,
295 F. Supp. 2d 996 (W.D. Ark. 2003) ......................................................21

*Davis v. Federal Election Commission*,
554 U.S. 724 (2008)..................................................................................16

*Davison v. Randall*,
912 F.3d 666 (4th Cir. 2019) ......................................................................26

*Di Biase v. SPX Corp.*,
872 F.3d 224 (4th Cir. 2017) ....................................................................12

*Edwards v. Aguillard*,
482 U.S. 578 (1987).....................................................................................36

*Epperson v. Arkansas*,
393 U.S. 97 (1968).......................................................................................37

*Garcetti v. Ceballos*,
547 U.S. 410 (2006)............................................................................... 32, 33

*Giovani Carandola, Ltd. v. Bason*,
303 F.3d 507 (4th Cir. 2002) ......................................................................39

*GLBT Youth in Iowa Schools Task Force v. Reynolds*,
114 F.4th 660 (8th Cir. 2024) .....................................................................23

*Gonzalez v. Douglas*,
269 F. Supp. 3d 948 (D. Ariz. 2017) ...........................................................30

*Griswold v. Driscoll*,
616 F.3d 53 (1st Cir. 2010)..........................................................................31

*Hazelwood School District v. Kuhlmeier*,
484 U.S. 260 (1988)............................................................................ *passim*

*In re Search Warrant Issued June 13, 2019*,
942 F.3d 159 (4th Cir. 2019) ......................................................................13

*Keyishian v. Board of Regents*,
385 U.S. 589 (1967).................................................................................. 2, 11

*Kikumura v. Hurley*,
242 F.3d 950 (10th Cir. 2001) .....................................................................38

*Little v. Llano County*,
138 F.4th 834 (5th Cir. 2025) ............................................................... 23, 25

*Little v. Llano County*,
146 S. Ct. 886 (2025) (mem.) .....................................................................25

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)....................16

*Mahmoud v. McKnight*,
102 F.4th 191 (4th Cir. 2024)....................27

*Matal v. Tam*,
582 U.S. 218 (2017).................... 24, 36

*Meyer v. Nebraska*,
262 U.S. 390 (1923)....................37

*Mills v. District of Columbia*,
571 F.3d 1304 (D.C. Cir. 2009)....................38

*Minarcini v. Strongsville City School District*,
541 F.2d 577 (6th Cir. 1976).................... 16, 20

*Nken v. Holder*,
556 U.S. 418 (2009)....................39

*North Carolina v. Covington*,
581 U.S. 486 (2017)....................40

*PEN America Center, Inc. v. Escambia County School Board*,
711 F. Supp. 3d 1325 (N.D. Fla. 2024)....................16

*Pendleton v. Jividen*,
96 F.4th 652 (4th Cir. 2024)....................12

*Penguin Random House v. Robbins*,
172 F.4th 581 (8th Cir. 2026)....................22

*Polk v. Montgomery County Public Schools*,
166 F.4th 400 (4th Cir. 2026)....................32

*Right to Read Defense Committee of Chelsea v. School Commitee of City of Chelsea*,
454 F. Supp. 703 (D. Mass. 1978)....................20

*Roberts v. Madigan*,
702 F. Supp. 1505 (D. Colo. 1989)....................21

*Roberts v. Madigan*,
921 F.2d 1047 (10th Cir. 1990) ....................................................................21

*Roe v. Department of Defense*,
947 F.3d 207 (4th Cir. 2020) ........................................................................12

*Rossignol v. Voorhaar*,
316 F.3d 516 (4th Cir. 2003) ................................................................ 26, 27

*Salvail v. Nashua Board of Education*,
469 F. Supp. 1269, 1272 (D.N.H. 1979) ......................................................21

*Satellite Broadcasting and Communications Association v. FCC*,
275 F.3d 337 (4th Cir. 2001) ........................................................................27

*Sheck v. Baileyville School Committee*,
530 F. Supp. 679, 681 (D. Me. 1982)............................................................20

*Shurtleff v. City of Boston*,
596 U.S. 243 (2022)........................................................................... *passim*

*South Carolina Coastal Conservation League v. U.S. Army Corps of Engineers*,
127 F.4th 457 (4th Cir. 2025) .......................................................................12

*South Carolina Education Association v. Campbell*,
883 F.2d 1251 (4th Cir. 1989) ......................................................................28

*Sweezy v. New Hampshire*,
354 U.S. 234 (1957)..........................................................................................2

*Tinker v. Des Moines Independent Community School District*,
393 U.S. 503 (1969)........................................................................................35

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025)........................................................................................40

*Virden v. Crawford County*,
No. 2:23-CV-2071, 2024 WL 4360495 (W.D. Ark. Sept. 30, 2024).................20

*Virgil v. School Board of Columbia County*,
862 F.2d 1517 (11th Cir. 1989) ................................................................ 29, 30

*Walls v. Sanders*,
144 F.4th 995 (8th Cir. 2025) .................................................................. 25, 32

*West Virginia Association of Club Owners & Fraternal Services, Inc. v. Musgrave*,
553 F.3d 292 (4th Cir. 2009) ..........................................................................38

*West Virginia Board of Education v. Barnette*,
319 U.S. 624 (1943).........................................................................................22

*Winter v. Natural Resources Defense Council, Inc.*,
555 U.S. 7 (2008)........................................................................................ 12, 14

*Woolard v. Thurmond*,
170 F.4th 701 (9th Cir. 2026) ..........................................................................32

*Zykan v. Warsaw Community School Corp.*,
631 F.2d 1300 (7th Cir. 1980) .........................................................................37

**Statutes**

10 U.S.C. § 2164 ..............................................................................................36

20 U.S.C. § 921 ................................................................................................36

28 U.S.C. § 1292 ................................................................................................3

28 U.S.C. § 1331 ................................................................................................2

**Other Authorities**

11A Charles Alan Wright et al., Federal Practice and Procedure § 2948.2 (3d ed. 1998) ..........................................................................................................39

11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1 (2d ed. 1995)................................................39

Department of Defense Education Activity, *About DoDEA*,
https://www.dodea.edu/about/about-dodea .....................................................37

## INTRODUCTION

In the middle of the last school year, Plaintiffs, twelve students from military families, began to notice changes at their schools—beloved books like *Between the World and Me* by Ta-Nehisi Coates and *George* by Alex Gino vanished from the library; an Advanced Placement textbook chapter they had recently studied and would soon be tested on was suddenly considered banned content; and Black History Month lessons and celebrations were cancelled at the last-minute. Plaintiffs and their families would soon learn that the Department of Defense Education Activity ("DoDEA"), the subagency in charge of public schools on military bases, was "quarantining" hundreds of books and dozens of curricular materials, all in response to President Trump's statement that he was "getting wokeness out of our schools and out of our military" via Executive Orders ("EOs") banning so-called "gender ideology" and "discriminatory equity ideology."

Plaintiffs immediately took action by demanding an accounting of what had been removed, participating in protests against censorship, and filing this lawsuit. The district court correctly recognized the grave First Amendment injury being suffered by Plaintiffs and issued a preliminary injunction requiring books to be put back on shelves and curriculum to be restored in the five schools where Plaintiffs were enrolled last year. But, being military families, many of them have moved or

are about to move. Only a system-wide injunction will provide a workable way for Plaintiffs to receive complete relief as they move from school to school.

In its briefing, the Government presents a vision of what information is accessible in public schools as being under the unconstrained authority of political actors with no limitations provided in the Constitution. But this vision is a stark rebuke to the Supreme Court's admonition that "[t]eachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957). For this reason, the Court recognized that "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967) (citation omitted).

## STATEMENT OF JURISDICTION

The district court possessed federal question jurisdiction over Appellees/Cross-Appellants' ("Plaintiffs") claims in this action pursuant to 28 U.S.C. § 1331. JA61. In exercising that jurisdiction, the district court granted in part and denied in part Plaintiffs' requested preliminary injunction. JA57–JA58. Defendants timely appealed the grant of preliminary injunctive relief, JA247–JA248, and Plaintiffs thereafter timely cross-appealed that portion of the ruling regarding the

limited scope of preliminary injunctive relief. JA249–JA251. This Court thus has jurisdiction over these consolidated appeals pursuant to 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

Whether the district court correctly recognized that DoDEA book removals and curricular changes based on EOs banning concepts related to race and gender violated the Plaintiffs' First Amendment rights.

Whether the district court erred by refusing to apply the preliminary injunction to all DoDEA schools and libraries subject to the book removals and curricular changes implemented by the Defendants.

## STATEMENT OF THE CASE

### *Facts*

On April 15, 2025, Plaintiffs—a group of twelve children[1] (from six different families) who were enrolled in schools operated by the United States' DoDEA both within the United States and abroad—filed suit to challenge, on First Amendment

[1] At the time of filing, the student Plaintiffs ranged in age from pre-kindergarten to eleventh grade. JA126 (S.K., a first grader, and E.K., a fourth grader, both at Crossroads Elementary School in Virginia); JA166 (O.H., S.H., and H.H., in pre-kindergarten, kindergarten, and fourth grade, respectively, at Barsanti Elementary on Fort Campbell); JA169 (E.G., a fourth grader at Barsanti Elementary); JA172 (E.Y. and C.Y., in ninth grade and eleventh grade, respectively, at Aviano Middle-High School on Aviano Air Base in Italy); JA179 (L.K.1, a fourth grader, and L.K.2, a sixth grader, at Sollars Elementary, and L.K.3, an eighth grader, at Edgren Middle-High School, on Misawa Air Base in Japan); JA195 (M.T., an eleventh grader at Aviano Middle-High School on Aviano Air Base in Italy).

grounds, DoDEA's implementation of book removals and curricular changes in accordance with the dictates of three EOs issued by the President of the United States. JA59–JA105.

Specifically, on January 20, 2025, the President issued Executive Order No. 14168 ("EO 14168"). JA87–JA90. That EO, titled "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," defines "gender ideology" as an "internally inconsistent" set of ideological beliefs, including "the idea that there is a vast spectrum of genders that are disconnected from one's sex[,]" labeling as a "false claim" the viewpoint that transgender and nonbinary gender identities exist. JA87–JA88. And it directs all federal agencies, including the Department of Defense, to remove statements and cease communicating about what the government deems to be "gender ideology" and "gender identity." JA88.

The President also issued Executive Order No. 14185 ("EO 14185"), titled "Restoring America's Fighting Force," JA92–JA94, prohibiting the Department of Defense and its educational institutions from promoting or teaching so-called "divisive concepts" about race or sex. JA93. Further, the President issued Executive Order No. 14190 ("EO 14190"), titled "Ending Radical Indoctrination in K-12 Schooling," JA96–JA100, which, *inter alia*, instructed the Secretary of Defense to formulate a plan to eliminate "support for" and "indoctrination in" "gender ideology

and discriminatory equity ideology" in its K-12 schools. JA97. EO 14190 defined "discriminatory equity ideology" as:

> [A]n ideology that treats individuals as members of preferred or disfavored groups, rather than as individuals, and minimizes agency, merit, and capability in favor of immoral generalizations, including that:
>
> (i) Members of one race, color, sex, or national origin are morally or inherently superior to members of another race, color, sex, or national origin;
> (ii) An individual, by virtue of the individual's race, color, sex, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;
> (iii) An individual's moral character or status as privileged, oppressing, or oppressed is primarily determined by the individual's race, color, sex, or national origin;
> (iv) Members of one race, color, sex, or national origin cannot and should not attempt to treat others without respect to their race, color, sex, or national origin;
> (v) An individual, by virtue of the individual's race, color, sex, or national origin, bears responsibility for, should feel guilt, anguish, or other forms of psychological distress because of, should be discriminated against, blamed, or stereotyped for, or should receive adverse treatment because of actions committed in the past by other members of the same race, color, sex, or national origin, in which the individual played no part;
> (vi) An individual, by virtue of the individual's race, color, sex, or national origin, should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion;
> (vii) Virtues such as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist or were created by members of a particular race, color, sex, or national origin to oppress members of another race, color, sex, or national origin; or
> (viii) the United States is fundamentally racist, sexist, or otherwise discriminatory.

JA96–JA97.

Based on these directives, as well as guidance from the Secretary of Defense, DoDEA instructed its staff that certain library books, as well as "instructional resources potentially related to gender ideology or discriminatory equity ideology topics," were, effective immediately, no longer available to students, or even to staff for instructional purposes. JA102; JA104 (emphasis omitted). Though DoDEA's then-Director, Dr. Schiavino-Narvaez, initially characterized the number of books removed from circulation as "a small number of items," JA102, it was later determined that DoDEA's implementation of the EOs resulted in the removal of 596 books from its libraries. JA235–JA246. And DoDEA altered or removed components of its curriculum, including immediately cancelling "all planned special activities" related to cultural awareness months, JA119, and further stated that guest speakers from diverse backgrounds were allowed only "if the speaker's focus is on military service, leadership, or history rather than cultural identity awareness." JA121. DoDEA also immediately ceased using specific instructional resources related to race and gender, including (a) high school lessons on gender and sexuality in AP Psychology, (b) middle school lessons on Black History Month and human health, and (c) elementary school lessons on immigration and Civil War veteran Albert Cashier. JA104–JA105.

Due to the various book removals and curriculum changes implementing the EOs, Plaintiffs suffered harm from the denial of access to books previously available

to them and the deprivation of curricular content and cancellation of cultural awareness months. For example, Plaintiff O.H. chose Maya Angelou, a renowned author and poet, as the subject of her Black History Month presentation prior to its abrupt cancellation. JA168. After she completed her research and preparations, her DoDEA school's Black History Month was cancelled along with all corresponding presentations. JA168. This denied O.H. the opportunity to present her research and to learn from her peers' Black History Month projects. JA168. Likewise, Plaintiff M.T.'s school also cancelled cultural history months. JA197. At M.T.'s DoDEA school, Black History Month lessons once included biographical studies on Ruby Bridges, Rosa Parks, and Martin Luther King, Jr. JA197. But after implementation of the EOs, no such events were held for Black History Month, Women's History Month, or (at that time, the anticipated) Asian American and Pacific Islander Heritage Month, which was of particular importance to M.T.'s mother who identifies as Asian American. JA197. M.T. also suffered harm because M.T. was enrolled in AP Psychology, and DoDEA Europe mandated that a unit on gender in that course be removed even though the AP examination would include that material. JA195–JA196. Likewise, C.Y. lost the opportunity to fully prepare for her AP Psychology exam because of the removal of Module 32 (on gender and sex) in all DoDEA schools. JA174–JA175. Indeed, the Plaintiffs identified specific adverse, ongoing, and irreparable harms caused by DoDEA's implementation of the EOs at all DoDEA

schools. *See, e.g.*, JA132 (removal of 4th grade reading titled, "A Nation of Immigrants," deprived E.K. of the opportunity to learn about the text as part of her curricular instruction); JA132–JA133133 (cancellation of Black History Month displays and instruction deprived E.K. of curricular material); *see also* JA219–221 (declaration of Dr. Jayme Linton, DoDEA Chief Academic Officer, identifying curricular materials removed from instruction at all DoDEA schools).

***Procedural History***

Plaintiffs filed their lawsuit on April 15, 2025, JA59–JA105, and moved for a preliminary injunction on May 7, 2025. JA106–JA109. In their motion, Plaintiffs sought to enjoin Defendants from removing library books and curricular materials from all DoDEA schools pursuant to EOs 14168, 14185, and 14190 and their implementing guidance. JA106–JA107. After full briefing and oral argument, the district court granted in part and denied in part the preliminary injunction motion on October 20, 2025, JA13–JA58, and then subsequently denied Defendants' motion for reconsideration of that ruling. JA222–JA246. Defendants timely appealed the preliminary injunction ruling, JA247–JA248, and Plaintiffs timely cross-appealed. JA249–JA250.

***Developments Since the Preliminary Injunction***

Simultaneously with the filing of their cross-appeal, Plaintiffs also filed with the district court notice of changes to certain Plaintiffs' enrollment status that occurred after the preliminary injunction motion was filed. JA252–JA272. Those changes included: (1) Plaintiffs O.H. and E.G. no longer attended Barsanti Elementary, but rather a different DoDEA school—Fort Campbell Middle School ("FCMS")—during the 2025-26 school year, JA252–JA253; and (2) Plaintiffs E.K., S.K., L.K., L.K.1, and L.K.2 were not enrolled in a DoDEA school for the 2025–26 school year. JA253. And on February 27, 2026, the parent of one of the Plaintiffs now attending FCMS confirmed in her supplemental declaration that the books subject to the district court's preliminary injunction ruling were not available at FCMS's library, and that a FCMS official failed to confirm whether (or not) FCMS would adhere to the preliminary injunction ruling. JA276–JA278.

## SUMMARY OF ARGUMENT

Plaintiffs were properly granted a preliminary injunction because they are likely to succeed on the merits of their First Amendment claims against DoDEA's book quarantines and curriculum removals. Prior to filing the case, Plaintiffs did more than enough to establish standing because they were all directly impacted by curriculum changes and many families sought information and access to quarantined books.

*Board of Education Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982) is the Supreme Court's only case dealing with school library book removals and provides the appropriate standard for Plaintiffs' book claims. Since DoDEA relied upon "partisan" and "political" motivations and removed the books "to deny Plaintiffs access to ideas that they, by virtue of the Presidential EOs, found distasteful, 'radical' or 'divisive[,]'" JA45, DoDEA's book removals violated the *Pico* standard.

*Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), provides the operative precedent for students' First Amendment claims with regard to curriculum. *Hazelwood* strikes the correct balance in protecting students' First Amendment rights while allowing appropriate deference to school officials with regard to speech that "bear[s] the imprimatur of the school." 484 U.S. at 271. Under *Hazelwood*, a school may not restrict a student's First Amendment rights unless that restriction is "reasonably related to legitimate pedagogical concerns." 484 U.S. at 273 (footnote omitted). DoDEA's curricular removals fail under *Hazelwood* because as the district court held, it is difficult even to "contemplate the pedagogical basis" for such wide-ranging and scattershot censorship. JA51.

The Government contends that neither *Pico* nor *Hazelwood* applies and that library curation and curriculum management are immune from First Amendment review. While the Government can point to some circuits that have called school

curriculum "government speech," those decisions were incorrect and this Court should decline to join them. And no circuit court has held that school library selections constitute government speech. Under *Shurtleff v. City of Boston*, 596 U.S. 243 (2022), government speech applies only where the government is delivering its own message and school curriculum is not properly understood as such based on the history of public education, public perception of public education, and the degree of political control asserted over curricular decisions. Under Supreme Court precedent, public school curriculum is not properly understood as a coherent message being delivered by the government, but rather a place where students learn and grow into critical thinkers by being challenged by new ideas. *See Keyishian*, 385 U.S. at 603. Accordingly, this Court should affirm the preliminary injunction because it correctly recognized that DoDEA's actions here violated the constitutional limitations laid out in *Pico* and *Hazelwood*.

Separately, this Court should affirm the preliminary injunction and expand the preliminary injunction's scope system-wide because since the injunction was granted, Plaintiffs at covered schools have accessed previously banned materials and Plaintiffs at new schools not covered by the injunction are not able to access quarantined books and materials. This proves the injunction's necessity to secure access to banned materials, as well as the need for system-wide relief as Plaintiffs move frequently between schools.

## STANDARD OF REVIEW

> The requirements for a preliminary injunction are well-settled. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."

*Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 102–03 (4th Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

On review from the grant or denial of a preliminary injunction, this Court reviews the lower court's decision for abuse of discretion. *Pendleton v. Jividen*, 96 F.4th 652, 656 (4th Cir. 2024); *Di Biase v. SPX Corp.*, 872 F.3d 224, 229 (4th Cir. 2017). This Court reviews the scope of the preliminary injunction under that standard as well. *Roe v. Dep't of Def.*, 947 F.3d 207, 231 (4th Cir. 2020), *as amended* (Jan. 14, 2020).

And "[a] court abuses its discretion in denying preliminary injunctive relief when it 'rest[s] its decision on a clearly erroneous finding of a material fact, or misapprehend[s] the law with respect to underlying issues in litigation.'" *S.C. Coastal Conservation League v. U.S. Army Corps of Eng'rs*, 127 F.4th 457, 465–66 (4th Cir. 2025) (quoting *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 188 (4th Cir. 2013) (en banc)). "A court also 'abuses its discretion when it makes an error of law, or when it ignores unrebutted, legally significant evidence.'" *Id.*

(quoting *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 171 (4th Cir. 2019)).

## ARGUMENT

### I. THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION.

When DoDEA quarantined 596 books from its school libraries, removed 41 materials from its curriculum, and cancelled all cultural celebrations purely to comply with the President's order to "get[] wokeness out of our schools and out of our military," JA65, it violated Plaintiffs' First Amendment rights. The Supreme Court has recognized that while judges generally defer to school districts' authority over public education, the First Amendment protects students against "narrowly partisan or political" censorship, *Pico*, 457 U.S. at 870, with no "legitimate pedagogical" justification. *Hazelwood*, 484 U.S. at 273. Since Plaintiffs' constitutional rights are at stake and DoDEA is committed to continuing its censorship absent an injunction, Plaintiffs are entitled to preliminary relief.

According to the factors set forth in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008), parties seeking a preliminary injunction must establish 1) that they are likely to succeed on the merits of their claims, 2) that they are likely to suffer irreparable harm absent preliminary relief, 3) that the balance of equities favor movants, and 4) that an injunction is in the public interest. JA23. As the district court properly held, all four *Winter* factors weighed in favor of Plaintiffs, and a preliminary injunction is necessary and appropriate.

### *A. Plaintiffs are likely to succeed on the merits of their First Amendment claims.*

1. <u>Plaintiffs have standing.</u>

The Government essentially conceded below that at least one Plaintiff had standing for all claims at the time of filing, JA28 (quoting Defs.' Opp'n Mot. for Prelim. Inj., Dkt. 29 at 15), and the Government has never questioned Plaintiffs' standing to challenge DoDEA's removal of curricular materials, JA25 (quoting Defs.' Opp'n Mot. for Prelim. Inj., Dkt. 29 at 15).[2] The only dispute as to standing the Government has advanced relates to whether any Plaintiffs *other than* the one the district court discussed, L.K.3, have alleged sufficient facts to support standing to challenge DoDEA's removal of books from school library shelves. JA27 (quoting Defs.' Opp'n Mot. for Prelim. Inj., Dkt. 29 at 15). They did. The Government argues Plaintiffs' book removal claim is moot simply because one Plaintiff, L.K.3, is not currently enrolled in a DoDEA school. Defs.' Opening Appellate Br. at 31 ("Defs.' Br."). This argument misunderstands the standing requirement on multiple levels. As discussed below, L.K.3 was not the only Plaintiff with standing at the outset of the lawsuit and other Plaintiffs have maintained ongoing standing.

To establish Article III standing, Plaintiffs must show 1) a concrete, particularized, and actual or imminent injury-in-fact that is 2) fairly traceable to the

[2] "Dkt." numbers reference entries on the district court docket that are not included in the JA.

challenged action by Defendants, and is 3) likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). "[S]tanding is to be determined as of the commencement of the suit." JA30 (quoting *Lujan*, 504 U.S. at 570 n.5). But "[t]o qualify as a case fit for federal-court adjudication, an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 732–33 (2008) (citation omitted).

The district court did not specify exactly what Plaintiffs needed to show to prove standing but noted that "[c]ourts addressing analogous facts around book removals have [… ] found that a plaintiff's inability to check out a particular book, even if in the future, satisfies the injury-in-fact requirement." JA28 (citing *PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*, 711 F. Supp. 3d 1325 (N.D. Fla. 2024), *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177 (11th Cir. 2009)). Therefore, the district court focused on the Plaintiff who named specific book titles in their declaration, L.K.3. JA34. Notably, though, the district court never said that the other Plaintiffs fell short of establishing standing, it simply did not need to consider them individually. *See Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 583 (6th Cir. 1976) (determining that student plaintiffs had standing to raise a First Amendment right to receive information claim challenging the removal of

books from their school library without imposing any requirement plaintiffs had sought to check out the specific titles themselves).

In this case, DoDEA's refusal to disclose what books had been removed made it nearly impossible for Plaintiffs to name a "particular book" that had been removed. JA71. It was not until the district court ordered DoDEA to produce its list of 596 quarantined books that Plaintiffs learned which titles had been removed. JA222. The district court found it "troubling" that DoDEA "continue[s] to question Plaintiffs' standing on the basis that they failed to identify specific books while persistently refusing to share that relevant information with them in the first place." JA33. So, while DoDEA is correct that the district court tied its standing analysis primarily to L.K.3, the court made clear that naming a "particular book" title cannot be a prerequisite for standing where books have been removed for known reasons, but school officials refuse to name the books. The district court held that "[i]t is impermissible for Defendants to take an action implicating constitutional rights, fail to provide information on that action, and then accuse the parties of lacking precise information for standing in their claims challenging that action." JA34.

The court recognized that "Plaintiffs detail, in great length, the numerous instances in which they asked Defendants for a list of removed books, to no avail." JA33 (citing Keeley, Young, Kenkel, Tolley, and Henninger Decls.). The district court did not need to address the independent standing of each of these other

Plaintiffs, but the fact that they had tried to access information about the book quarantines was probative to the court. It follows that in a situation where the removed book titles are being withheld, a more appropriate test for standing would be for a plaintiff to express interest in accessing the removed materials and take some concrete action to gain access. Multiple Plaintiffs undoubtedly did so. JA133; JA169; JA174; JA180–JA190; JA195–JA197.

Indeed, Plaintiffs have done more than enough to show that they have standing on an ongoing basis. Soon after the preliminary injunction was granted, Plaintiffs provided notice to the district court that several students had changed schools, as is common for military families. JA252–JA253. Two Plaintiffs attend a new DoDEA school at Fort Campbell, Kentucky, JA258; JA263, while the Kenkels and Keeleys are not currently enrolled in DoDEA schools. JA268; JA272. The Kenkels' father is retired from active duty service and now "works for a company that is a contractor with the Air Force, so if we were sent overseas on behalf of his company our children would be eligible for DoDEA schools." JA272. The Keeleys have moved to Germany and chose non-DoDEA schools for this school year, but "intend to re-enroll [their] children in DoDEA schools should our current family or school situation change, or if [they] move in the future to a location where DoDEA schools are a desirable option." JA269.

Of the four families that currently have students in DoDEA schools, two provided supplemental declarations detailing their ongoing efforts to access particular titles on DoDEA's quarantine list. JA273–JA275; JA276–JA278. The Tolleys attested that "M.T. went to her school library and checked out three books that appear on DoDEA's quarantine list, namely: *The 57 Bus* by Dashka Slater, *George* by Alex Gino, and *Cemetery Boys* by Aiden Thomas." JA274. Because of the preliminary injunction currently in place, M.T. was able to access those books. JA275. By contrast, the Henningers attested that their daughter O.H. currently attends FCMS, a DoDEA school at Fort Campbell, Kentucky. JA277. When O.H.'s family requested *George* by Alex Gino, *All Boys Aren't Blue* by George M. Johnson, and *Between Perfect and Real* by Ray Stoeve, they were informed by the school librarian that those books were not available because of the DoDEA policy at issue in this lawsuit. JA277–JA278.

Somehow, the Government is still not satisfied that Plaintiffs have standing. The Government argues that M.T.'s book request does not establish standing "because she did not allege any intention to check out these or any other books in the future." Defs' Br. at 35–36. The Government continues to move the goalpost as it now argues that even going to the library and requesting quarantined titles is not enough. With regard to O.H., DoDEA argues that since she currently attends a school that is not subject to the injunction, "any injury O.H. may suffer, thus, cannot sustain

an injunction entered with respect to schools he does not attend." *Id.* at 36. But DoDEA cannot have it both ways: how can M.T.'s successful book request be invalid because the injunction is in place at her school, while O.H.'s unsuccessful book request is invalid because the injunction is *not* in place at her school?

Plaintiffs have established standing because they expressed interest in reading books on the quarantine list, they have taken concrete steps to try to access the books, and they need the court's intervention to get access to the books. In fact, "the majority of courts faced with a school book banning case have held that the removal of a book was unconstitutional." *Case v. Unified Sch. Dist. No. 233*, 895 F. Supp. 1463, 1469 (D. Kan. 1995) (citations omitted); *see also Virden v. Crawford Cnty.*, No. 2:23-CV-2071, 2024 WL 4360495, at *1 (W.D. Ark. Sept. 30, 2024) (school officials cannot require removal of books "containing LGBTQ themes"); *Minarcini*, 541 F.2d at 584 (school officials must replace Kurt Vonnegut and Joseph Heller novels after removal "by purchase, if necessary"); *Sheck v. Baileyville Sch. Comm.*, 530 F. Supp. 679, 681, 693 (D. Me. 1982) (granting preliminary injunction where school removed *365 Days* by Ronald J. Glasser, "a compilation of nonfictional Vietnam War accounts by American combat soldiers"); *Right to Read Def. Comm. of Chelsea v. Sch. Comm. of City of Chelsea*, 454 F. Supp. 703, 715 (D. Mass. 1978) (school officials cannot remove anthology book written by students touching on mature themes); *Salvail v. Nashua Bd. of Educ.*, 469 F. Supp. 1269, 1272, 1275

(D.N.H. 1979) (school board ordered to replace magazine on library bookshelves and resubscribe to the magazine); *Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996, 1005 (W.D. Ark. 2003) (restrictions on access to books, even if the books remain in the library, are unconstitutional); *Roberts v. Madigan*, 702 F. Supp. 1505, 1513 (D. Colo. 1989), *aff'd*, 921 F.2d 1047 (10th Cir. 1990) (school officials cannot require removal of the Bible from school library). This Court should not accept DoDEA's invitation to set the standing bar impossibly high.

2. DoDEA's book quarantines violate the First Amendment.

DoDEA's February 5, 2025 directive to "immediately" remove books "potentially related to gender ideology or discriminatory equity ideology topics" from circulation, Ex. 4 to Compl., Dkt. 1-4, led to the "quarantine" of nearly 600 titles from DoDEA schools, Ex. 20 to Pls.' Mem. Supp. Prelim. Inj., Dkt. 10-22. The quarantined book list speaks for itself, heavily featuring women, non-White, and LGBTQ+ authors and characters. JA235–JA246. Award-winning literature, like Ta-Nehisi Coates' *Between the World and Me* and Alex Gino's *George*, were in DoDEA libraries because of their high quality and educational value, but they have been removed in an effort to impose ideological conformity. Under any applicable First Amendment test, the Government cannot decide to remove hundreds of books from public school libraries purely to silence ideas and voices the President wants to erase.

*Pico* "is the only Supreme Court decision dealing specifically with removal of books from a public school library" and "must be used as a starting point." *Unified Sch. Dist. No. 233*, 895 F. Supp. at 1469. The *Pico* plurality held that school boards "may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.'" *Pico,* 457 U.S. at 872 (quoting *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)). Thus, the primary inquiry under *Pico* is whether the government had an impermissibly censorial motive for removing books from school libraries.

*Hazelwood v. Kuhlmeier* set forth the First Amendment test that applies to student First Amendment claims regarding educational curriculum, or speech that bears the "imprimatur of the school." 484 U.S. 260, 271 (1988) (plaintiffs challenged school officials' editing a student newspaper column). Under *Hazelwood*, a school may restrict a student's First Amendment rights only if such action is "reasonably related to legitimate pedagogical concerns." *Id.* at 273 (footnote omitted). While some courts have applied *Hazelwood* instead of *Pico* to school libraries, *see Penguin Random House v. Robbins*, 172 F.4th 581, 585 (8th Cir. 2026), the choice of standard does not change the outcome because DoDEA's book removals bear no relationship to any legitimate pedagogical concern. Quite to the contrary, removing books that

reflect a wide range of experiences and voices undercuts all we know about how to encourage curious and critical students.

The Government does not defend its censorship on its own terms—indeed there is no mention of the content that was removed in DoDEA's brief—but rather argues that the district court applied the wrong First Amendment standard. The Government contended that library curation was "government speech," Defs.' Opp'n Mot. for Prelim. Inj., Dkt. 29 at 17–19, but that argument was properly rejected by the district court, JA35–JA39, and even the Government's best case, *Little v. Llano County*, did not go that far. 138 F.4th 834, 837 (5th Cir. 2025) (less than a majority of the en banc Fifth Circuit joined the "government speech" holding); *see also GLBT Youth in Iowa Schs. Task Force v. Reynolds*, 114 F.4th 660, 667 (8th Cir. 2024) (observing that "the Supreme Court has not extended the government speech doctrine to the placement and removal of books in public school libraries."). Below, the Government argued in the alternative that *Hazelwood* provides an appropriate test for school libraries and that DoDEA's book removals could survive *Hazelwood*. Defs.' Opp'n Mot. for Prelim. Inj., Dkt. 29 at 19–22. Notably, on appeal, the Government appears to have abandoned its argument that book removals would survive under *Hazelwood* while stopping short of asserting that school library curation is "government speech." Defs.' Br. at 42–44. Abandoning this argument is wise. The Supreme Court warned that judges "must exercise great caution before

extending [the Court's] government-speech precedents" because "it is a doctrine that is susceptible to dangerous misuse." *Matal v. Tam*, 582 U.S. 218, 235 (2017). No circuit court has said that school library contents are government speech, and this Court should not be the first.

The district court carefully analyzed *Pico*'s precedential value and the applicability of *Hazelwood* in the school library context. JA40–JA43. The court observed that "in reviewing challenges to public school library removals, most courts have simply declined to resolve the *Pico* and *Hazelwood* dilemma and, instead, applied both cases." JA43. Applying *Pico*, the district court held that "Plaintiffs have demonstrated a likelihood of showing that Defendants' stated motivations for removing over 500 library books set forth an impermissible partisan or political motivation." JA44. To reach this conclusion, the court pointed to the President's statements about "wokeness," JA44, as the explicit "partisan or political" justification behind the EOs and DoDEA's book quarantines. JA44–JA45. The district court highlighted that DoDEA never argued that the quarantined books lack "educational suitability," which would have been a legitimate justification under *Pico*. JA45. The district court also noted that "the faulty implementation of the removals" points to the Government's impermissible motives, as DoDEA's quarantined book list "does not differentiate between the appropriateness and

pedagogical interests across different age groups," and books were removed "without even completing the detailed review process." JA46.

In response, the Government points to a circuit split, Defs.' Br. at 41–43, noting that some circuits have rejected *Pico* as binding precedent. *Id*. at 42 (citing *Little v. Llano Cnty.*, 138 F.4th 834 (5th Cir. 2025), *cert. denied*, 146 S. Ct. 886 (2025) (mem.); *Walls v. Sanders*, 144 F.4th 995 (8th Cir. 2025); and *ACLU of Fla. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177 (11th Cir. 2009). The Government argues that "*Pico* is of no precedential value," Defs.' Br. at 41 (quoting *Little*, 138 F.4th at 844), but this Court has never said as much. The Fifth Circuit in *Little* expressly overruled circuit precedent and is properly viewed as "contraven[ing] the weight of precedent in other jurisdictions. JA38. Also running counter to the other federal appellate jurisdictions that have opined on this issue, the Eighth Circuit in *Walls* recently held that K-12 students lack a First Amendment right to receive information by misreading *Pico*, holding that the case "lacks any holding as to the First Amendment[.]" 144 F.4th at 1003. However, a majority of Justices on the *Pico* Court agreed that removing materials from school libraries implicates students' First Amendment rights. In addition to the three-Justice majority, Justice Blackmun's partial concurrence noted that the Supreme Court's cases "command" a First Amendment limitation on why government officials may remove a library book. *Pico*, 457 U.S. at 878–79 (Blackmun, J., concurring in part). Likewise, Justice White,

in his concurrence with the judgment, thought that the case should be remanded for further fact-finding about the school board's specific reasons—an exercise that would have been pointless if no facts could have established a First Amendment violation. *Id.* at 883–84. And even Justice Rehnquist, joined by Chief Justice Burger and Justice Powell in dissent, "cheerfully concede[d]" that "[o]ur Constitution does not permit the official suppression of ideas[,]" including in schools. *Id.* at 907 (Rehnquist, J., dissenting (quoting plurality op.) (emphasis omitted)). Though this Court has not had occasion to apply *Pico* in a school library case, it has repeatedly cited the *Pico* plurality opinion in a favorable manner. In *Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019), this Court considered whether county-level elected officials violated the First Amendment by blocking residents on social media. In holding that the Chair of the Board of Supervisors violated the First Amendment, the unanimous opinion by Judge Wynn cited *Pico*'s famous warning that "[i]f a Democratic school board, motivated by partisan affiliation, ordered removal of all books written by or in favor of Republicans, few would doubt that the order violated the constitutional rights of the students denied access to those books." 912 F.3d at 685 (quoting *Pico*, 457 U.S. at 870–71).

In *Rossignol v. Voorhaar*, 316 F.3d 516, 522 (4th Cir. 2003), this Court considered whether the publisher of a local newspaper could sue local government officials for mass purchasing newspapers that contained critical coverage. A

unanimous panel held that the publisher's claims had been improperly dismissed, with Judge Wilkinson writing that "[t]he First Amendment is about more than a publisher's right to cover his costs. Indeed, it protects *both* a speaker's right to communicate information and ideas to a broad audience *and* the intended recipients' right to receive that information and those ideas." 316 F.3d at 522 (citing *Pico*, 457 U.S. at 867).

In *Satellite Broadcasting and Communications Association v. FCC*, 275 F.3d 337, 353 (4th Cir. 2001), this Court considered satellite television providers' First Amendment claims against the Federal Communications Commission's "carry one, carry all" rule. Judge Michael, joined by Judges Niemeyer and Widener, even as they affirmed the dismissal of plaintiffs' claims, cited *Pico* for the proposition that "the First Amendment guarantees viewers and listeners the right to receive information" even if that right is not unlimited. 275 F.3d at 353 (citing *Pico*, 457 U.S. at 867).

Most recently, in *Mahmoud v. McKnight*, 102 F.4th 191 (4th Cir. 2024), a decision that was overturned by the Supreme Court, Judge Quattlebaum in dissent recognized that "[s]chool decisions—even as to curriculum—must comply with the 'transcendent imperatives of the First Amendment.'" *Id.* at 217–18 (citing *Pico*, 457 U.S. at 864). This Court also cited *Pico* without any indication of its supposed precedential frailty as far back as *South Carolina Education Association v.*

*Campbell*, 883 F.2d 1251, 1259 n.8 (4th Cir. 1989). In that case, the unanimous court included *Pico* in a string cite supporting the observation that "[l]egislative motive, in the context of First Amendment controversies, may be relevant when the challenged legislation has on its face some content-based, *direct* inhibiting effect on freedom of speech or some other expressive activity or enterprise." *Id*. In light of these Fourth Circuit cases, DoDEA's assertion that "[t]he district court erred in embracing the plurality opinion in *Pico*" is without merit. Defs.' Br. at 40.

As the district court held, "Defendants' arguments do not fare any better under the *Hazelwood* standard." JA47. The district court was "skeptical whether library books can reasonably be said to 'bear the imprimatur of the school[,]'" JA47 (quoting *Hazelwood*, 484 U.S. at 271), such that *Hazelwood* would apply, but "[e]ven if *Hazelwood* provided the proper standard here, Defendants have not demonstrated legitimate pedagogical interests behind the book removals." JA48. The court pointed out that "the book removals implement, in whole, the President's EOs, which are not limited to or inclusive of 'any pedagogical standards or priorities.'" JA48 (quoting Defs.' Opp'n Mot. for Prelim. Inj., Dkt. 29 at 22). "Merely limiting books on 'gender ideology and discriminatory equity ideology' and ones with 'invidious race and sex discrimination,' as these concepts are defined by the EOs, is not sufficient to establish a pedagogical concern." JA48 (quoting Defs.' Opp'n Mot. for Prelim. Inj., Dkt. 29 at 22).

3. DoDEA curriculum removals violate the First Amendment.

When the government removed educationally valuable information from its curriculum, like a chapter from the AP Psychology textbook and health education lessons, while banning cultural celebrations, it violated Plaintiffs' First Amendment right to receive information. JA72. *Hazelwood*, which applies to students' First Amendment rights regarding school curricula, provides the appropriate standard. As the district court noted, while the Government "appear[ed] to argue that curriculum constitutes government speech, their analysis rests entirely on the *Hazelwood* standard." JA50 (citing Defs.' Opp'n Mot. for Prelim. Inj., Dkt. 29 at 10). In effect, "[n]either party dispute[d] that *Hazelwood* applies" to Plaintiffs' curricular claims. JA50. Both the Ninth and the Eleventh Circuits have recognized a student's right to receive information in school curriculum applying *Hazelwood*. *See Arce v. Douglas*, 793 F.3d 968 (9th Cir. 2015) and *Virgil v. Sch. Bd. of Columbia Cnty.*, 862 F.2d 1517 (11th Cir. 1989).

In *Arce*, public school students challenged a statute barring school districts from providing curriculum that, inter alia, "[is] designed primarily for pupils of a particular ethnic group"—a restriction that led to the elimination of a school district's Mexican American Studies program. 793 F.3d at 973. The Ninth Circuit concluded that the students' First Amendment right to receive barred the state from removing "materials otherwise available in a . . . classroom unless its actions are

reasonably related to legitimate pedagogical concerns." *Id.* at 983 (citing *Hazelwood*, 484 U.S. at 273) (footnote omitted). On remand, the District of Arizona ultimately determined that the challenged statute violated students' First Amendment right to receive curricular information. *Gonzalez v. Douglas*, 269 F. Supp. 3d 948 (D. Ariz. 2017). The district court held that the statute's stated goal of "reduc[ing] racism in schools" was "a legitimate pedagogical objective," but the court concluded that the statute in fact amounted to unconstitutional curricular censorship "enacted and enforced for narrowly political, partisan, and racist reasons." *Id.* at 973.

Likewise, the Eleventh Circuit in *Virgil* applied *Hazelwood* to determine that the First Amendment requires public school officials to advance legitimate pedagogical interests where they remove material from school classrooms. *Virgil*, 862 F.2d at 1521–22. While legitimate pedagogical interests may include ensuring curricular materials are age appropriate, *id.* at 1522–23, mere objections to the ideological or political viewpoint cannot justify removal. The Eleventh Circuit ultimately determined that the school board acted out of a legitimate pedagogical concern when it removed the sexually explicit passages from mandatory curriculum based on the interest of ensuring age appropriateness of the materials. *Id.*

Since the Government had "not put forward any purported pedagogical interests around the effectiveness or age appropriateness of curriculum to justify

removal," JA51, applying *Hazelwood* to DoDEA's actions is not a close call. As the district court held,

> In all candor, the Court cannot contemplate the pedagogical basis for banning the "Gender and Sex" module from Advanced Placement Psychology; lessons on immigration in elementary school; chapters on "Human Reproductive System, Menstrual Cycle, and Fetal Development," "Abuse and Neglect," and "Adolescence and Puberty" from health education textbooks; and celebrations related to "identity months," including Black History and Women's History Months.

JA51–JA52. Add to those examples true stories about a Civil War soldier who was born a woman but fought in disguise as a man and a transgender teenager who is accepted by his adopted family, and it is impossible to defend DoDEA's censorship on pedagogical grounds. On appeal, the Government does not even try.

Instead, the Government argues that "selecting school curricula is core government speech," Defs.' Br. at 16, and is therefore immune from First Amendment review. The Government concedes that their approach is a departure from longstanding precedent. Defs.' Br. at 22–23. Nevertheless, the Government cites a variety of cases to support this proposition, but only a few out-of-circuit cases have held that school curriculum decisions are government speech. *See Griswold v. Driscoll*, 616 F.3d 53 (1st Cir. 2010) (plaintiff challenged state board of education's decision to revise curriculum before it had been implemented), *Chiras v. Miller*, 432 F.3d 606 (5th Cir. 2005) (plaintiffs challenged the state board of education's decision

not to approve funding for providing a specific textbook in schools), and *Walls*, 144 F.4th 995 (8th Cir. 2025) (plaintiffs waived their argument against government speech and the court abrogating circuit precedent).[3]

The government also points to this Court's opinions in *Boring v. Buncombe County Board of Education*, 136 F.3d 364 (4th Cir. 1998) and *Polk v. Montgomery County Public Schools*, 166 F.4th 400 (4th Cir. 2026), but those concerned teachers' First Amendment claims, not students' right to receive information, and neither case includes the term "government speech." In deciding those cases, this Court appropriately relied upon the Supreme Court's government-employee speech line of cases, applying *Connick v. Myers*, 461 U.S. 138 (1983), in *Boring*, and applying *Garcetti v. Ceballos*, 547 U.S. 410 (2006), in *Polk*. In citing these cases, the Government conflates government employee speech under *Garcetti* with "government speech" under *Shurtleff v. City of Boston*, 596 U.S. 243 (2022). The government employee speech inquiry evaluates whether a public employee is speaking in their capacity as an employee or as a private citizen for the purposes of *their own* First Amendment speech rights. To be clear, Plaintiffs have never disputed

[3] In *Woolard v. Thurmond*, 170 F.4th 701 (9th Cir. 2026), the Ninth Circuit considered a petition to rehear en banc a panel decision that held that parents cannot insist on the inclusion of sectarian curriculum in their public charter schools. In ruling that the families had no First Amendment right to dictate curriculum, 6 of the 11 judges joined an opinion calling public school curriculum "government speech," but the court was primarily concerned with the Religion Clauses and did not abrogate or even mention *Arce*, which remains good law.

that *Garcetti* applies to teachers' classroom instruction, nor have they brought First Amendment claims on behalf of teachers in this case. *See* JA61–JA62; JA81–JA84; Pls.' Reply Supp. Prelim. Inj., Dkt. 36 at 10–11. It is therefore uncontroverted that, since teachers' classroom instruction is "pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." *Garcetti,* 547 U.S. at 421. That is, teachers are not protected by the First Amendment to say whatever they want in classrooms. This is because "[a] government entity has broader discretion to restrict speech when it acts in its role as employer" than it does when it acts as sovereign. *Id.* at 418; *accord Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1051 (6th Cir. 2001) (citing *Boring*, 136 F.3d at 368–69) ("[T]he Fourth and Fifth Circuits have determined that a teacher, in choosing what he will teach his students, is not speaking as a citizen, but rather as an employee on matters of private interest.").

In spite of the Supreme Court's admonition in *Matal v. Tam*, the Government proposes to extend government speech doctrine to public school instruction, and in so doing extend immunity from First Amendment review. To decide whether a message that is indisputably emanating from the government is perceived as "communicat[ing] governmental messages," *Shurtleff*, 596 U.S. at 248, the Supreme Court has prescribed a "holistic inquiry […] driven by a case's context rather than the rote application of rigid factors." *Id.* at 252. The Court set out three, non-

dispositive "indicia," namely "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Id.* at 244. In *Shurtleff*, the question was whether flags flying atop Boston's City Hall might accurately be described as "government speech." Weighing the three indicia, the Court found that "some evidence favors Boston, and other evidence favors Shurtleff," *id.* at 253, ultimately holding unanimously that in the specific context of the City Hall flag flying program, the "government speech" doctrine did not apply to the flags. *Id.* at 258.

Justice Alito's concurrence, joined by Justices Thomas and Gorsuch, provides further support for a narrow understanding of "government speech." In the concurrence, those justices posit that "Government speech is [] the purposeful communication of a governmentally determined message *by a person exercising a power to speak for a government*." *Id.* at 268 (emphasis added). Based on this understanding, not all speech coming from government employees or material curated by government agencies is automatically "government speech" for First Amendment purposes.

Taking each *Shurtleff* indicator in turn, it is clear that K-12 instruction is not "government speech." First, K-12 instruction has not historically been a tool for partisan propagandizing and political micromanagement. In fact, courts have long

recognized that educators and local school officials' decisions deserve significant deference in their pedagogical decision-making. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507 (1969) (noting that the Court has "repeatedly emphasized the need for affirming the comprehensive authority" of state and local education officials to administer public schools). The absence of substantial caselaw addressing presidential or gubernatorial edicts limiting education speaks to how rarely chief executives have taken on this role. DoDEA could not have achieved its award-winning quality if every commander-in-chief had re-made the school curriculum in his image.

Second, the public does not perceive K-12 teachers and other educators to be the government's mouthpieces for whatever message it chooses to convey. Of course, DoDEA schools are provided by the federal government as a benefit to employees and contractors, so no one doubts that they are public institutions on a basic level. But when students are in class, neither they nor their families understand themselves to be receiving a message directly from the President, any more than students in locally run public schools expect to receive messages hand-selected by their governor. For example, when a public school teacher assigns students to read a work of fiction, whether it be an innocuous title like *Frog and Toad Are Friends* or a quarantined book like *Lumberjanes* about a group of summer campers who solve mysteries, those works are not somehow communicating a

governmental message. Teachers are expected to impart information, but also to teach students how to be critical thinkers. One common way to encourage empathy and creative thinking is to hold classroom debates with students assigned to a particular viewpoint. If all instruction was "government speech" by virtue of being included in the school curriculum, it begs the question what exactly the government is saying. *Matal*, 582 U.S. at 219 (noting that "if trademarks become government speech when they are registered, the Federal Government is babbling prodigiously and incoherently"). "Families entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance" a particular viewpoint. *Edwards v. Aguillard*, 482 U.S. 578, 584 (1987). In that way, public school instruction is special – we perceive it neither as the teacher's personal views, nor as the officially sanctioned message of the current political administration.

Third, Plaintiffs do not contest that DoDEA is an arm of the federal government, but the relevant question is to what degree the President and Secretary of Defense "actively shape[] or control" classroom instruction. *Shurtleff*, 596 U.S. at 244. The Secretary of Defense is statutorily required to provide free education to children of servicemembers domestically, 10 U.S.C. § 2164, and internationally, 20 U.S.C. § 921, but DoDEA itself is responsible for creating and delivering education

materials and it has been under civilian control for generations.[4] In any case, the "state's power to prescribe a curriculum" must still be constitutionally "reasonable." *Meyer v. Nebraska*, 262 U.S. 390, 402 (1923). For example, the Supreme Court has held that a state cannot, consistent with the Constitution, outright "forbid[] the teaching in school of any subject except in English." *Id.* at 400. Similarly, "the First Amendment does not permit the State" to prohibit teaching the theory of evolution, "for the sole reason that it is deemed to conflict with a particular religious doctrine" held by those in power. *Epperson v. Arkansas*, 393 U.S. 97, 103, 106 (1968). It is not constitutionally appropriate for DoDEA officials to "begin to substitute rigid and exclusive indoctrination for the mere exercise of their prerogative to make pedagogic choices regarding matters of legitimate dispute." *Zykan v. Warsaw Cmty. Sch. Corp.*, 631 F.2d 1300, 1306 (7th Cir. 1980).

In the classroom, teachers have substantial control over pedagogy and instruction, and discussions. Teachers are generally responsible for developing lesson plans on a daily basis, choosing which materials, exercises, and other resources to employ during a particular day or period, as well as responding to student questions. Teachers' ability to provide high-quality, responsive instruction is directly impeded by DoDEA's censorship and that is negatively affecting learning

[4] Dep't of Def. Educ. Activity, *About DoDEA*, https://www.dodea.edu/about/about-dodea.

and civic development. Br. of Amici Curiae Fed. Educ. Ass'n & Nat'l Educ. Ass'n Supp. Pls.' Mot. Prelim. Inj., Dkt. 25-1 at 8–9.

If the Government is correct that there are no First Amendment guardrails on K-12 instruction, then students and their educations are truly subject to the whim of whichever party or administration is currently in power. According to the Government, any state could tomorrow ban mention or discussion of any disfavored idea—whether it is true or false, controversial or universally-accepted—and students would have no recourse. This Court should not encourage this undermining of our public school system and the students therein.

*B. The remaining* Winter *factors favor Plaintiffs.*

Although the first *Winter* factor is often dispositive, the remaining factors—irreparable harm, balance of equities, and public interest—all favor an injunction. Under long-established Supreme Court precedent, "in the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits of plaintiff's First Amendment claim." *W. Va. Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009); *see also Mills v. Dist. of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009). Indeed, "[w]hen an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) (quoting 11A

Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1 (2d ed. 1995)). The Government's suppression of Plaintiffs' ability to receive information at school, where that suppression is grounded purely in differences of political ideology, constitutes irreparable harm.

When the Government is the party opposing injunctive relief, the balance of equities and public interest factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "When a plaintiff is claiming the loss of a First Amendment right, courts commonly rule that even a temporary loss outweighs any harm to [the Government] and that a preliminary injunction should issue." 11A Charles Alan Wright et al., Federal Practice and Procedure § 2948.2 (3d ed. 1998) (footnote omitted). Here, DoDEA's removal of books from their classrooms and libraries heavily burdens Plaintiffs' First Amendment rights. *See supra*, Section I.A. Restoring books and curricula will cause no injury to DoDEA. As the Fourth Circuit has recognized, the Government "is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Centro Tepeyac*, 722 F.3d at 191 (quoting *Giovani Carandola*, *Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002)). And, on the last factor, "upholding constitutional rights surely serves the public interest." *Giovani Carandola*, 303 F.3d at 521.

## II. THE PRELIMINARY INJUNCTION SHOULD APPLY SYSTEM-WIDE.

In the district court, Plaintiffs argued for a system-wide injunction because DoDEA's book and curriculum removal policy "facially violate the First Amendment, causing systemwide harm." Pls.' Reply Supp. Prelim. Inj., Dkt. 36 at 18. However, in light of *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), which was decided between briefing and argument on the Motion for Preliminary Injunction, the district court limited its injunction to the five schools attended by Plaintiffs at the time they filed. JA56. In so doing, the district court mistakenly stated that "Plaintiffs have brought neither a facial challenge nor a putative class action" and provided scant other reasoning for such a narrow injunction. JA56. But, notwithstanding the district court's mischaracterization of Plaintiffs' facial claim, *CASA* stands for the principle that "an injunction will offer complete relief *to the plaintiffs before the court.*" 606 U.S. at 852. Indeed, the Supreme Court has recognized that to provide complete relief to plaintiffs, courts must take account of "what is necessary, what is fair, and what is workable," in accordance with "well-known principles of equity." *North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (internal quotation marks and citations omitted).

So, while "universal injunctions" are prohibited under *CASA*, a systemwide injunction is necessary to provide Plaintiffs complete relief because military families move frequently, changing duty stations every two to three years. The unworkability

of a school-based injunction has become clear. Since last year, seven out of twelve Plaintiffs have changed schools. JA252–JA253. Two Plaintiffs currently attend a school that is not covered by the injunction. JA257–JA264. In the Fall of 2026, three Plaintiffs plan to enroll in DoDEA schools in South Korea, JA279, and others are likely to change schools, as well. Since the injunction is school-based, Plaintiffs are suffering and will suffer exactly the harm the district court saw fit to shield them from.

Even if the injunction were to shift to be a student-based injunction, ensuring that transferring students would maintain their relief, such an arrangement would still require schools to change their curriculum based on Plaintiffs' enrollment at any given time, and that is unnecessarily onerous to systemwide curriculum planning and teachers' lesson preparation which will soon be underway for next Fall. Students sometimes move schools in the middle of the school year which would pose an impossible situation for that child's new school as well as their former school. If a student moved some time in February, their old school may decide to cancel Black History Month lessons and their new school would have to restore its curriculum to the status quo of January 2025. But DoDEA normally operates as a single district with a shared curriculum, so school-based or student-based curriculum adjustments are unworkable. A system-wide injunction is the clearest, most workable, and simplest way for Plaintiffs to receive the relief they deserve.

## CONCLUSION

For the reasons explained above, this Court should affirm the preliminary injunction against DoDEA's book quarantines and curriculum removals and expand the scope of the injunction system-wide.

## ORAL ARGUMENT STATEMENT

This case involves novel and significant legal issues concerning the fundamental right to receive information guaranteed by the U.S. Constitution. Because the complexity and importance of these issues would benefit from a full hearing before this Court, Appellees/Cross-Appellants respectfully request oral argument pursuant to Local Rule 34(a).

Dated: 05/27/2026

Respectfully submitted,

/s/ Emerson Sykes

EMERSON J. SYKES
ACLU FOUNDATION
125 BROAD STREET, 18TH FLOOR
NEW YORK, NY 10004
(212) 549-2500
esykes@aclu.org

COREY M. SHAPIRO
WILLIAM E. SHARP
ACLU OF KENTUCKY FOUNDATION
325 W. MAIN STREET, SUITE 2210
LOUISVILLE, KY 40202
(502) 581-9746
corey@aclu-ky.org
wsharp@aclu-ky.org

MATTHEW W. CALLAHAN
EDEN HEILMAN
ACLU OF VIRGINIA FOUNDATION
P.O. BOX 26464
RICHMOND, VA 23261
(804) 644-8080
mcallahan@acluva.org
eheilman@acluva.org

*Counsel for Plaintiffs-Appellees/Cross-Appellants*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), I certify that this Principal Brief for Appellees/Cross-Appellants complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2)(B) because it contains 9,557 words. This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365, the word processing system used to prepare the brief, in 14 point font in Times New Roman font.

Dated: 05/27/2026

/s/ Emerson Sykes
Emerson Sykes